[No. 28595. Department Two. April 24, 1942.]

IRA EMERSON CLEVELAND, *Respondent,* v. SUN LIFE ASSURANCE COMPANY OF CANADA, *Appellant.*[1]

[1] Reported in 125 P. (2d) 251.

*Eggerman & Rosling,* for appellant.

*Rigg, Brown & Halverson* and *Paul M. Goode,* for respondent.

JEFFERS, J.—Plaintiff, Ira Cleveland, on February 19, 1941, instituted this action in the superior court for Yakima county, against the Sun Life Assurance Company of Canada, to recover judgment on a total disability clause in a life insurance policy issued to plaintiff on March 12, 1931. In his complaint, plaintiff alleged that he had been totally disabled since October, 1937, and sought to recover the amount of payments due under the policy from June 25, 1940, to the time of trial, and the further sum of two hundred dollars per month which would accrue until the final determination of this action.

Defendant by its answer admitted the issuance of the policy; that all premiums have been duly and timely paid, and that the policy has been at all times and is now in full force and effect; that plaintiff furnished to defendant proof in writing that plaintiff was totally disabled; that defendant approved plaintiff's claim for disability payments from February 25, 1938, and paid to plaintiff the sum of two hundred dollars per month from February, 1938, up to and including May 25, 1940, at which time defendant ceased making payments to plaintiff; that defendant recognized that, in accordance with the terms of the policy, all subsequent premiums falling due on the policy during the continuance of such disability would be waived. Defendant denied that plaintiff has been or is totally disabled, under the terms of the policy.

The case went to trial before the court without a jury, upon one issue, which all parties agree was whether or not plaintiff was totally disabled from May 25, 1940, to the date of trial, within the meaning of the

total disability clause of the policy. The trial court, after hearing the evidence, entered findings of fact, conclusions of law, and judgment, finding that plaintiff was totally disabled, and entering judgment in his favor.

The policy here in question contains the following disability endorsement:

"Supplementary Provisions for Waiver of Premiums and Monthly Income during Total Disability

"Attached to and made part of Policy No. 1278901 on the life of Ira Emerson Cleveland

"In consideration of the payment of an additional yearly premium of One Hundred and Six 60/100 Dollars, which additional premium is included in the premium stated on the first page of the said policy, the Company hereby agrees that, if due proof shall be received by it at his Head Office in Montreal that the assured, whilst the said policy and these supplementary provisions are in full force and effect and before the maturity date, has become totally disabled by bodily injury or disease occurring after the payment of the first premium, so as to be prevented thereby from performing any work for *compensation or profit or from following any gainful occupation* and that such disability has existed continuously for not less than four months and is then existing, it will grant the following benefits: –

"1.  Waiver of Premiums.—The Company will waive the subsequent premiums, if any, as they shall become due during the continuance of such disability beginning with the premium the due date of which next succeeds the date of commencement of such disability; provided, however, that no premium shall be so waived the due date of which is more than one year prior to the date of receipt at the Head Office of the Company of written notice of claim under these supplementary provisions.

"2.  Monthly Income.—The Company in addition will pay, during the continuance of such total disability, to the assured or, if such disability is due to or accompanied by mental incapacity, to the beneficiary

under the policy, a monthly income of one per cent of the assurance set forth on the first page of the said policy for each completed month of such disability beginning with the fourth such month and ceasing with the last payment preceding the death of the assured or with the first payment becoming due after the maturity date; provided, however, that in no case shall any such monthly income be paid for the first three months of such disability nor for any fractional part of a month of such disability nor for any period of such disability more than one year prior to the date of receipt at the Head Office of the Company of written notice of claim under these provisions." (Italics ours.)

The above are the material terms of the policy involved in this action.

No question is raised as to the amount or form of the judgment entered June 14, 1941, if plaintiff is entitled to recover herein.

Defendant has appealed from the judgment entered, and assigns error upon the finding by the trial court that respondent was continuously and totally disabled by reason of arthritis, from May 25, 1940, to the date of trial, and prevented thereby from performing any work for compensation or profit, or from following any gainful occupation. Error is also assigned upon the entry of judgment in favor of respondent.

While the trial court did not make a specific finding as to the type of arthritis with which respondent is afflicted, we are of the opinion it conclusively appears from all the evidence, including the testimony of Drs. Lewis and Cornett, called by respondent, and Dr. England, called by appellant, that Mr. Cleveland has what is known as "hypertrophic arthritis." It is important to keep in mind the type of arthritis with which respondent is afflicted, as all the doctors testified that at least seventy-five per cent of men over fifty years of age are afflicted to some extent with this

disease. Especially is the disease evidenced by conditions of the spine. We think the testimony of the doctors is also conclusive that evidence of this disease in itself is of no particular clinical value unless accompanied by pain; that pain is a subjective symptom, and a doctor must depend, to a great extent, upon what his patient tells him as to the amount of pain suffered, especially in this type of arthritis, as there may be evidence of the disease without accompanying pain; that the pain is the disabling factor.

The medical testimony is to the effect that there are two recognized types of arthritis—hypertrophic arthritis and atrophic arthritis. The former is evidenced by an overgrowth of bone in the form of little spurs or proliferations, called "lipping." It not only is evident on the margins of the bone, but is also prevalent in the attachment of the muscles to the bone where the muscles originate. The type of arthritis is not changed by the number of spurs or the amount of lipping that may be present.

Atrophic arthritis is sometimes called arthritis deformous, or rheumatoid arthritis, and is evidenced by a destruction or wasting away of the bone. It is regarded as more serious, and usually involves many of the joints, especially the smaller joints of the hands and feet. The joints are puffy, swollen, and inflamed, and, when the patient is afflicted with this type of arthritis affecting his spine, he is stooped over, with a stiff back.

It seems to be admitted that there is no recognized treatment of hypertrophic arthritis, other than rest, regular living, heat applications, light exercise, diet, and warm climates. On the other hand, there are well-recognized methods of treating atrophic arthritis, by the removal of the focus of infection by administering certain vaccines.

Dr. Cornett, on direct examination, testified as follows:

"Q. Would you say that condition appears in a pronounced condition or not, Doctor? A. This is not an exaggerated amount of hypertrophic changes."

On cross-examination, the following occurred:

"Q. Is the condition which is portrayed by the X-rays taken in March of this year [March 14, 1941] an unusual condition for a man of his age? A. No, it is not. Q. You, I presume, in the course of your work, have seen many pictures of men younger than he [Mr. Cleveland] is where the lipping and proliferation is far greater than it is in this set of pictures, isn't that true? A. That is quite true. Q. Is that hypertrophic condition or that process which you have described as lipping, spurring, and so forth, of any particular clinical significance in a hypertrophic case? A. To me this type of appearance has rather definite clinical significance. Q. I am thinking of just in so far as the hypertrophic evidence appears on the plates. A. Hypertrophic changes in itself, no. Q. Well, that was just what my question was. Excepting in so far as it may be accompanied with other symptoms, such as pain or something of that sort, the mere fact that a man has a little spurring upon his vertebral joints is merely insignificant, isn't it? A. Well, the common belief is that approximately 80 per cent of adults who have reached the age of fifty years will show some hypertrophic changes in their spine. Q. Doctor, I was reading a report yesterday which placed that percentage at 100 per cent, universal. Would you agree with that? A. I would— . . . Q. If we were to combine the hypertrophic changes that come into your office into let's say mild, moderate and severe, how would you classify these particular pictures when applied to a man fifty-six years old? . . . A. I would classify these as mild."

Both Dr. Lewis and Dr. Cornett testified that Mr. Cleveland was totally disabled during the period involved herein; in fact, they testified that in their

opinion he had been totally disabled since October, 1937. They also testified there had been a progression of the disease from 1937 to 1941; that it started in the lumbar region of the spine and had progressed up through the dorsal and into the cervical region. Dr. Lewis's opinion was based to a considerable extent, and necessarily so, upon the X-ray pictures taken by Dr. Cornett on April 26, 1937, and March 14, 1941. Dr. Cornett's opinion was based to a great extent, if not entirely, upon these pictures. However, it appears that a different machine was used to take the pictures in 1937 than that used in 1941, and in regard to these machines Dr. Cornett testified:

"Q. Now, were those pictures taken in 1937 and 1941 by the same machine? A. No, they were not, and I qualified my statement to that extent, if you will remember. . . . I was merely going to state that our present equipment represents a considerable technical advance over what we had in 1937."

It is a little difficult to understand just how Dr. Lewis and Dr. Cornett could tell, at least from the X-ray pictures, that there had been a progression of the disease from 1937, from the lumbar to the dorsal and cervical regions of the spine, as Dr. Cornett testified that in 1937 they took no pictures of the dorsal or cervical regions.

"Q. If you had had that same equipment for taking the pictures in 1937, don't you think it may have shown the lipping and spurring on the dorsal vertebrae which you said you would not see in the 1937 pictures? A. Oh, I might have shown them with the machine I had. We didn't have *dorsal or cervical regions radiographed* at that time. Q. Are you able to say, Doctor, whether the lipping which appears in 1941 is due to the technical advance in the machine which you then used or whether it is due to a progress in the disease? A. I think I have testified that it could be due to a better

or more satisfactory radiograph, but that my opinion is that it is the progress of the disease."

Because it appears from the testimony of all the doctors that this type of arthritis is not necessarily disabling, unless accompanied by pain, and as it appears that the X-ray pictures indicate respondent is afflicted with only a mild form of spurring or lipping, it is apparent that the doctors' opinion as to respondent's total disability was based, to a considerable extent, upon respondent's statements as to the amount of pain he suffered. In fact, Dr. Lewis testified that he relied one hundred per cent upon what his patient told him. It therefore becomes important to see what activities respondent has voluntarily engaged in during the time he claimed to be disabled.

Before discussing the testimony further, it may be well to have in mind what construction this court has placed upon the term "totally disabled," as used in insurance policies. Both parties cite the case of *Storwick v. Reliance Life Ins. Co.*, 151 Wash. 153, 275 Pac. 550, in which we construed a total disability clause in substance the same as that under consideration here. In the cited case, we stated:

"Under such disability clauses, we think the question of total disability should be determined in the light of the capabilities and training of the insured, especially where his capabilities and training are evidenced in the contract of insurance, as here.

"It seems to us that one is totally disabled, within the meaning of these policies, when he is so far disabled that he cannot, with any degree of success, within the range of his normal capabilities, earn wages or profit in some occupation or gainful pursuit."

Let us now see what Mr. Cleveland's training has been, what work he has been doing through the years, and what his activities have been during the time he claims he was totally disabled.

Trial of this case started on May 19, 1941, and at that time respondent was fifty-five years of age, his next birthday being in September, when he would be fifty-six. The following statement, except where otherwise indicated, is the testimony of respondent himself:

Respondent is a high school graduate, and has studied horticulture at college for two years. He finished college in 1910, and from that time on was continuously engaged in some branch of the fruit business. He testified that he had been connected with every branch of the fruit business, from the growing on up to exporting it.

From 1922, Mr. Cleveland was engaged in the fruit brokerage business, which consisted of buying and selling fruit and produce of practically all kinds that are produced in the Yakima valley, as well as evaporated apples. The fruits dealt in were cherries, apricots, peaches, pears, apples, and prunes. The cherry season being a short one, that crop was only a small part of his business, and a good many seasons he did not buy cherries at all. As an exporter he had dealt principally in apples, pears, and evaporated apples. About seventy-five per cent of his business in 1936 was export, and twenty-five per cent domestic.

At this point we desire to call attention to the testimony of C. F. Schaefer, called by respondent. This witness had been in the brokerage business in the Yakima valley for seventeen years, and was acquainted with Mr. Cleveland and his methods of doing business, having transacted business with him. He testified that most of the brokers in the valley handled shippers' supplies in connection with their business, and that the brokers did some financing of shippers. The supplies consisted of such things as spray, boxes, paper, etc. He testified that Mr. Cleveland's opera-

tions covered most of these functions, and that he knew Mr. Cleveland financed ranchers.

While respondent did not testify specifically to the operations mentioned by Mr. Schaefer, unless they were meant to be included in his general statement that he had been engaged in all lines of the fruit business, he did not deny the statements made by the witness.

Mr. Schaefer also testified that in his opinion, for a man to succeed in the brokerage business, it was necessary that he put in long hours in the office; that he usually was in his office from nine to six. He also testified that he did not do much of the outside work; that his work was of the managerial type.

Mr. Cleveland described his duties in connection with the various crops he handled, in substance, as follows: The first crop was cherries, and the first thing to do was to secure a supply of cherries to sell, which was done by contacting the growers or groups of growers. After securing the supply, the next step was to start negotiations with customers at the other end, to find out about markets and the most likely markets, and to keep in touch with the markets up to the time the fruit began to move. When a customer was found, he was shipped the amount of fruit he wanted. The cherry season comes in June, and usually lasts ten to twelve days.

Mr. Cleveland dwelt at some length on the long hours it was necessary to put in during the cherry season, but it is apparent, as we have said, that the cherry season is short, and some years respondent did not deal in cherries at all.

Mr. Cleveland also testified at some length in regard to the physical labor involved in inspecting fruit, handling boxes, etc., but it appears that, even before Mr. Cleveland claimed to have been disabled, with the

exceptions of the years 1934 and 1935, he had a man who did most of what might be called the outside work, such as inspecting the fruit.

We again desire to digress and refer to the testimony of R. G. Airey, a witness for respondent. Mr. Airey went to work for respondent in June, 1936, as outside man, and assisted in handling the 1936 cherry crop, which that season was bought at Lewiston. Mr. Airey testified that he did most of the work in connection with the handling of that crop. After the cherry crop was taken care of, he went back to Yakima and worked for respondent until March, 1937. He also worked for respondent, as field man, from September; 1937, to March, 1938.

Prior to 1934, a Mr. Kyle worked for respondent for three or four years, inspecting fruit and receiving fruit for sale, and doing the outside work, the same as Mr. Airey did in 1936.

We have referred to the above testimony, because of the fact that Mr. Cleveland testified that, in order to successfully carry on his business as a broker, it was often necessary for him to go into the warehouse and lift down a box of apples or other fruit in order to inspect it, when as a matter of fact it appears that, even before his claimed disability, he had a man who did the greater part, if not all, of this work.

We again refer to the testimony of Mr. Cleveland, which is to the effect that after the cherry season came the apricot season, and that his operations in handling this crop were about the same as those during the cherry season, except that he was not required to put in such long hours.

After the apricots came peaches, pears, and apples. The peach season was about the same as the apricot season, except that the hours were not so long. Then

came pears. The apple season started in September and ran through until spring, and Mr. Cleveland described his duties in connection with this crop, as follows:

"Well, your duties would be contacting your growers or shippers, whoever had a supply of fruit to sell, and to find out what it consisted of, and quote it out, and after it was quoted out, if you got an acceptance on it, why, you would go look at the fruit, probably, and make a confirmation or, if it might be some customer that you weren't so particular about, you would depend entirely upon a government inspection; some customers, however, are not taking fruit on government inspection because they can get government inspection anywhere and any time. In those cases, such as my own, I had certain customers that either I saw the fruit myself or someone that I had working for me would see it, because there are many markets that are entirely different with reference to inspection."

In regard to the export business, he testified as follows:

"A. Well, in my particular instance, I would either go around as I did before and contact the shipper or the supplier—if you could call it supplier, then I think that would cover all, both growers, which means growers, shippers and cooperative organizations and all—and find the fruit available and it was quoted out for export the same as it would be quoted out domestically, only the quotation would be made f. a. s., ship-side at the boat, either f.a.s. Montreal, Seattle or Portland, or wherever the case might be from which I would be quoting it, sometimes San Francisco. Q. Now, did this export operation require you to inspect the fruit before you quoted that fruit out? A. It did not require me to inspect the fruit, but if I expected to keep my customers it was necessary that I saw I got fruit suitable for their market, the same as I did on the domestic business."

Respondent stated that dried fruit was sold c. i. f., that is, cost, insurance, and freight. His testimony continued:

"You buy that by the pound and transfer it from the pound to the kilo, and add all of your costs and freight and insurance and the different items that come in. That's a very particular and a very concentrated piece of work, translating those figures, one from the other."

Mr. Cleveland stated that he did this work himself, and that the busiest period of the year was from September to about the middle of December, after which the business would taper off to almost nothing in May, as far as shipments were concerned.

Respondent employed a Mrs. Rightmire in his office for about eleven years. This lady was very competent, and did a great deal of the office work. Respondent testified that, while he always wrote his telegrams in longhand, he dictated his letters, and Mrs. Rightmire handled all the accounting; "I never paid any attention to that."

We, of course, appreciate that the successful operation of any business which is competitive requires time and attention, and we, of course, do not pretend to say that it does not require physical exertion as well as mental, but we have set out this testimony of Mr. Cleveland to show, as we think it does, his wide experience in all branches of the fruit business, and also to show that his duties have been, to a very considerable extent, those of an executive. It also indicates to us the possibilities open to a man with such training and experience to participate in some branch of this business, even though he might not be able personally to do the field work and whatever physical labor might be necessary in inspecting fruit.

We now come to the testimony of Mr. Cleveland relative to his physical condition, and, in connection

with his testimony, as we proceed we shall discuss the testimony of the doctors, especially that of Dr. Lewis.

At the time respondent made application for the policy of insurance herein referred to, he was forty-five years of age, and apparently in good health. While he testified that his back began to hurt him in the spring of 1936, his claim of total disability shows that the first indication he had of failing health was in November, 1936, and that is about the time he consulted a Dr. West, who suggested that he have his teeth out, the doctor also prescribing a course of "Crowe serum." Respondent had his teeth taken out, and took the serum through December, 1936, but apparently obtained no relief.

In the spring of 1937, respondent and his wife took quite an extensive trip by automobile through Idaho, Colorado, Wyoming, Kansas, Texas, and Louisiana to contact customers. Respondent stated that he suffered considerably on this trip, and at one point thought he would have to return home. After his return from this trip, the pain in his back "was happening more often," and on April 3, 1937, he consulted Dr. Lewis, who had been his family doctor.

Dr. Lewis testified that he first examined respondent for his arthritic condition on April 3, 1937, at which time respondent complained to him that he had been bothered with pains in his back since November, 1936, and that the pains had grown worse. On April 26, 1937, Dr. Cornett took X-ray pictures of the lumbar region of respondent's back, and Dr. Lewis testified that these pictures showed an arthritic condition, for which he prescribed some capsules, the constituent of which was a form of salicylates. The doctor advised respondent at that time to get all the rest he could, and that he should not work to the point of fatigue.

Dr. Lewis next saw respondent on July 10, 1937, at

which time respondent's condition was about the same. Respondent stated to the doctor that being on his feet for any length of time aggravated the pain. The doctor gave respondent a prostatic massage, and found the prostate normal. Respondent was wearing an abdominal belt at that time, which seemed to help him. The doctor prescribed nothing additional at that time.

The doctor next saw respondent December 16, 1937. The record shows that Dr. Lewis testified from his notes that respondent thought he had improved a little through the summer months, but did not think he had improved since July; that he thought he was worse since November, and that his condition was just about the same as it was a year ago.

Dr. Lewis's office record also showed that respondent still complained of pain in his back when on his feet too long, when he sat down too long, and when he lay down too long; that respondent had not been at his office more than two hours daily since November 15th; that the X rays taken in April showed hypertrophic arthritis of the spine.

At this time, Dr. Lewis began to treat respondent with streptococcal vaccine, administered intravenously, and this treatment continued through to March, 1938. Salicylates were also administered along with the vaccine after about January, 1938. Respondent did not seem to be benefited by this treatment, and it was discontinued March 28, 1938.

Sometime in October or November, 1937, respondent ceased going to his office, and the work was carried on by Mr. Airey and Mrs. Rightmire, and, after she left, a Miss Walker, until March, 1938, when the office was closed. In August, 1938, Mrs. Rightmire entered into a lease with respondent, and continued the business under respondent's name. Under this lease, Mr. Cleveland was to receive a share of the profits. Mrs.

Rightmire operated until the fall of 1940, when she closed the office. It is a fair inference from the testimony of Mr. Cleveland that, at the time the office was closed, there was practically no export business.

About March 23, 1938, respondent applied for payments under the total disability clause of the policy, and as shown by his statement made at that time to appellant, he first felt indications of failing health in November, 1936, and became totally disabled October 25, 1937. This statement to appellant was accompanied by a certificate of Dr. Lewis, which shows that respondent was afflicted with hypertrophic arthritis of the lumbar and dorsal spine; that X rays of the spine and pelvis, taken April 26, 1937, show hypertrophic arthritis, lipping and spurring of vertebral margins, and ligament attachment areas. In his certificate, the doctor, answering a query as to causes of disability, stated: "Unknown. Has had all known foci of infection removed." The doctor stated that respondent had been totally disabled since October 25, 1937, and that he believed respondent's condition was permanent.

Also accompanying Mr. Cleveland's statement was the certificate of a friend, Lester W. Rightmire, to the effect that he considered respondent totally disabled, and that he believed the cause of his disability was either arthritis or lumbago; that he got his information from the assured.

Apparently appellant made no physical examination of respondent at this time, but accepted the statement of respondent and the certificates of Dr. Lewis and Mr. Rightmire, and, based upon this showing, appellant started making to respondent payments of two hundred dollars per month. On August 5, 1938, respondent was at Dr. Lewis's office, and on August 6th, the doctor made a report to appellant, in which the

doctor again stated the cause of disability was hypertrophic arthritis, with lipping and spurring of vertebral margins, and ligament attachment areas—lumbar spine. It will be noticed that in this report the doctor made no mention of the dorsal area being affected. The report stated that respondent would be able to resume business "possibly in one or two years," and that respondent's condition was not growing worse. At this time, the doctor advised respondent to continue with the advice he first gave him as to regular hours and exercise.

The next time Dr. Lewis saw respondent was on June 12, 1939, at which time the doctor made another report to appellant. In this report, the doctor gave the same cause of disability as in previous reports, and further stated there was limitation of the spine in the lumbar area. In all of these reports, the doctor stated that respondent was not confined to his bed or home. He further stated that Mr. Cleveland was taking hot baths, massage treatments, and sun baths. At this time, respondent informed the doctor that he thought the pain was higher up in the dorsal area. The doctor's office record has an entry on that date, "Has played considerable golf."

Respondent next visited the doctor on December 18, 1939, at which time respondent told the doctor that he saw little difference in his condition, and that he thought he had received the most benefit from the steam baths and massages. About this time, respondent talked with the doctor about going to a warmer climate, and the doctor advised him to go to California or Florida to rest.

Mr. and Mrs. Cleveland left Yakima the fore part of April, 1940, on an automobile trip which covered about eleven thousand miles. On this trip, which Mr. Cleveland said was mainly a pleasure trip, they went

through Idaho, Arizona, Texas, Louisiana, Florida, New York, and from there home, where they arrived the latter part of June. On the trip, respondent and his wife took turns driving. They did not hurry, and when Mr. Cleveland got tired, they would stop. However, it does not appear that they stopped longer than over night, except in Florida and New York. They visited Zion and Bryce parks and the Grand Canyon. While in Florida, respondent went fishing for tarpon, with a Mr. Crom and a guide, in a twenty-five foot boat. On this fishing trip, they went out about eight in the morning and returned about noon. There is in the record a picture taken on their return from the trip, which shows respondent standing beside a sixty-five pound tarpon which had been caught. Respondent testified that he did not actually catch the fish, but that it was caught by Mr. Crom, respondent just standing beside it to have his picture taken. However, there is also in evidence a newspaper cut of the same picture, and accompanying the cut is an article, both of which appeared in a Yakima paper. The article purports to set out an interview between respondent and the reporter concerning the fishing trip, after respondent had returned home. Respondent admitted that the article was substantially correct, except that the article used the wrong pronoun. We quote from the article:

"It was getting along toward noon and we were just about deciding to quit for the day when this 65-pounder took hold of the plug on my line. It took 45 minutes to bring that fish up to the boat. He leaped high out of the water 14 times in efforts to break loose from the foot long plug he had taken into his mouth."

We admit that it took considerable courage for respondent to admit that he did not catch that fish, after the impression which undoubtedly had been left by the newspaper article and the picture accompanying it.

336

But whether or not respondent actually caught the fish, he apparently felt able at that time to go out in a twenty-five foot boat, fishing for tarpon. Respondent testified that he did not actually do much fishing on this trip, and that he was lying down at the time the fish was caught. We do not desire to be facetious, but we admit it is a little difficult to understand how a man who was able to go on such a fishing trip was totally disabled, especially after looking at the picture of respondent standing beside this fish.

After leaving Florida, respondent and his wife drove to New York, where he admitted he may have visited with his friends, the Croms, for as long as three weeks. While in New York, respondent visited the World's Fair two different days. Respondent stated that on these visits he took it easy, and would rest when he got tired. It should be kept in mind that all of this testimony was from respondent himself.

It thus appears that respondent and his wife made the eleven thousand mile trip in about two and one-half months, and out of this time they visited the parks and stopped in Florida and New York, so it is apparent that they must have driven some considerable distance each day they were on the road. Respondent stated that he bought a new car just before he started on the trip, and selected a car which was particularly easy for him to ride in.

After respondent's return from this trip, and on July 9, 1940, he again visited Dr. Lewis, at which time he told the doctor about his trip, and stated that he thought more of his spine was involved, "that it was higher up." The doctor at that time prescribed a head harness. In the doctor's office record, we find the following entries under this date:

"Have not been in since Dec. 18, 1939. Has been on masseur treatments with considerable soreness. Has had no 'severe' attacks since last Dec. 1939. Had

severe cold while on trip. To get head harness. No treatment."

On August 15, 1940, Dr. Lewis made another report to appellant, in which he stated that Mr. Cleveland had been under his care since April 26, 1937, with a hypertrophic arthritis which involved the lumbar vertebrae; that he had been totally disabled from the fall of 1937 because of this condition; that subsequent radiographs showed a definite progress, there being more lipping and new spur formation; that the claimant was totally and permanently disabled as regarded ability to perform any work for remuneration or profit. We are unable to tell to what "subsequent radiographs" the doctor referred, as none was taken from April 26, 1937, to November 27, 1940.

Respondent testified that he played considerable bridge at the Elk's club and at his friends' homes; that the ordinary game lasted from about eight to eleven; that he usually played at least once a week, some weeks two or three times, and others not at all, depending on how he felt.

During the winter of 1940, Mr. Cleveland, at the suggestion of his wife, joined the "Nine O'clock Dancing Club," and attended two dances held at the Commercial hotel. He did not think he danced over three times at either of these occasions.

During the fall of 1940, respondent went pheasant hunting on about half the open days. He stated that sometimes he went by himself, and sometimes with a man by the name of Sargent or a man by the name of Lewis; that he had his own dog, and hunted over him. The hunting was done in a locality known as "Badger Pocket," which is about thirty-five miles from Yakima, northeast of Ellensburg. Respondent would drive there and back the same day, and on at least two occasions he got his limit of birds. He stated that he

worked slowly, and would only go out about a half mile from the car. We quote:

"THE COURT: How many of these half-mile sashays would you take in a day? THE WITNESS: Oh, take about three of them. THE COURT: You found that you could do that without any bad effect on your back? THE WITNESS: Oh, I could make about three half-mile sashays and it wouldn't affect me. Some days I would feel it and sometimes wouldn't feel so tired."

Mr. Cleveland also went duck hunting on Toppenish creek three times during the duck season of 1940. On one trip he went with Mr. Sargent, and they drove the car to within about a hundred yards of the slough. On another trip he went with a Mr. Johnson, and one trip he went alone. On this last trip he got two ducks, but on the other trips he was not so successful.

Respondent also attended the Golden Glove boxing tournament, on three successive nights, where he sat on a bench and stayed through the entire performance, which lasted from one and one-half to two and one-half hours. He took a blanket and a cane with him on these occasions, and would lean forward on his cane.

He also attended ball games as often as he could, and always sat on the benches at these games. He stated that he was having a special chair built to take with him to the games. He took a cushion to sit on, and stayed through the game.

Mr. Cleveland also tried horseback riding, and went out on three occasions, but stated that it hurt him to ride, and he did not try it again.

He used to play considerable golf, but he stated that he had not played since the summer of 1938. However, in the records of Dr. Lewis, under date of June 12, 1939, the following entry appears: "Has played considerable golf."

It appears, both from the testimony of Dr. Lewis and Dr. England, that respondent was in good physical

condition, other than the spine affliction. Both of those doctors testified that all respondent's organs, such as heart, lungs, etc., were perfectly normal, and were functioning properly. In none of Dr. Lewis's reports does it appear that respondent was confined to his bed or his home.

Dr. England, called by appellant, examined respondent November 26, 1940, and he testified that he found nothing wrong with respondent, except that the condition of his spine indicated hypertrophic arthritis. The doctor further testified that the spinal condition found in Mr. Cleveland was prevalent in seventy-five to ninety per cent of men fifty-five years of age; that the condition had no clinical significance in itself; that, in the doctor's experience, about one per cent of the persons in Mr. Cleveland's condition have some pain; and that the disabling factor of hypertrophic arthritis is the pain. The doctor stated that, in his opinion, based upon his examination of respondent and the X-ray pictures introduced herein, a person afflicted as Mr. Cleveland is not incapacitated from carrying on with a degree of success duties "which primarily involve the managerial type, office duties, answering a telephone, making computations, wires, and matters of that sort." The doctor was then asked whether or not, based upon the same premise, Mr. Cleveland was disabled to the extent that he could not, with any degree of success and within the range of his normal capabilities, earn wages or profits in some occupation or gainful pursuit. The doctor answered no. A hypothetical question was then propounded to Dr. England, which we quote:

"Q. I am going to ask you to assume the existence of a man 56 years of age, in the middle 50's, whose spine is involved to the same extent that is disclosed by the pictures of the plaintiff in this case; and I will ask you to assume that the pain which that man has

as a result of that condition has not prevented him from voluntarily entering into the following activities:

[Then follows a description of the activities of Mr. Cleveland, which we have heretofore related.]

"Now, I will ask you, Doctor, assuming all of those facts to be true, and that the pain did not prohibit him from voluntarily participating in those activities, in your opinion is he so disabled that he could not, with any degree of success and within the range of the normal capabilities of an individual—I'm referring now, specifically, to Mr. Cleveland—earn wages or profit in some occupation or gainful pursuit?"

The witness answered "No."

We again refer to the cross-examination of Dr. Lewis. The doctor was asked whether respondent asked him if it would be proper to take an eleven thousand mile automobile trip, and the doctor answered:

"A. I don't think he did. I suggested either California or Florida as a warm climate. Q. Well, you had in mind going down there for a rest in the warmer climate, didn't you? A. Yes, sir."

On cross-examination, a hypothetical question was also propounded to Dr. Lewis, in which he was asked to assume the same facts as in the question propounded to Dr. England. There followed some discussion between court and counsel over some of the facts the doctor was asked to assume, after which the court asked the reporter to read the last part of the question, leaving out the detailed part. The reporter read:

"Doctor, I will ask you to assume that the pain resulting from the condition displayed by these X-ray pictures, which I have asked you to take into consideration, did not prohibit him from voluntarily entering into these activities. Now I am going to ask you to assume that degree of pain and ask you whether or not, in your opinion, that individual is so disabled that he cannot with any degree of success and within the

range of his normal capabilities earn wages or profit in some occupation or gainful pursuit."

The doctor replied: "My answer would be, 'No.'"

After the testimony was all in, and after Mr. Rosling, of counsel for appellant, had made his argument, in which he made reference to the above answer of Dr. Lewis to the hypothetical question, Mr. Halverson, of counsel for respondent, stated that he had not understood the answer of Dr. Lewis the same as Mr. Rosling had, and that if the court had understood Dr. Lewis's answer to mean that, under the facts stated in the hypothetical question, respondent was not disabled, he would ask permission to reopen the case and put the doctor on the stand. The court then stated that he had understood Dr. Lewis's answer to be in line with his general testimony, but that he would like to see the record.

Court then adjourned until nine-thirty the following morning, at which time the court stated that there was a misunderstanding because of the interpretation which the court put upon the answer of the doctor and that put upon it by Mr. Rosling. The court further stated that neither the question nor the answer was ambiguous, but nevertheless granted the motion to reopen the case. Dr. Lewis, who had been in the court room during this discussion, was then called to the stand, where the hypothetical question was again read to him, and he was asked how he had intended to answer the question, to which he replied: "I intended to answer that question, 'Yes,' that the man was totally disabled." Mr. Rosling then moved for a mistrial, because of statements made by the trial court in the presence of Dr. Lewis. The motion was denied. This was one of the errors claimed as the basis for the motion for new trial.

We are not passing upon the motion for new trial, but we have set out what transpired relative to the question propounded to Dr. Lewis and the action of the court relative to it, for the reason that the trial court considered the answer of Dr. Lewis to this question the deciding factor in the case. In its memorandum opinion, the court stated:

"I think Mr. Rosling's hypothetical question stated the crux of the case, and I think I will say now what I declined to say yesterday, that had Dr. Lewis's answer to the hypothetical question been what Mr. Rosling thought it to be, it would have been determinative."

There is no question in our minds but that Dr. Lewis's first answer to the hypothetical question was as understood by Mr. Rosling. As stated by the trial court, the question was plain, and the doctor's answer was plain. We appreciate, of course, the right of a witness to change or correct his testimony, and we also appreciate that it is sometimes difficult to follow a hypothetical question, but it is difficult for us in this case to see how the doctor could have misunderstood the question. Without intending to impugn the motive of Dr. Lewis, it is easy to understand, after the statement made by the trial court in the doctor's presence, and what transpired in the court room, that he must have understood the importance of his answer, and while it may be that in his first answer the doctor did not intend to testify that, under the facts stated in the hypothetical question, respondent was not totally disabled, he certainly answered that he was, and the doctor's change of testimony, under the circumstances here shown, cannot help but cast some doubt in our minds as to his second answer.

There was other testimony relative to the appearance of Mr. Cleveland during the period here involved, and as to the change in his condition and his inability

to carry on his business, among those so testifying being his wife and Mrs. Rightmire, his secretary.

We have carefully considered all the testimony as shown by the statement of facts of some four hundred pages, and we are forced to the conclusion that the testimony fairly preponderates against the finding of the trial court that respondent was, at the time of trial, and had been since October, 1939, totally disabled, under the terms of the policy.

Respondent described this pain in his back, in the following manner:

"Well, the pain was in my back, and, to describe that pain, about the best way I could describe it would be to say it's the same as if you were in poor condition and over-exercised your muscles, whether it was at football, baseball or something you were doing strenuously and you over-worked them, and that's the sort of pain that it is. It's not a shooting pain or anything of that kind, but it's that sort of pain. That's about as near as I can describe it."

We also fully appreciate that the trial court saw and heard the witnesses, but after all, in the type of arthritis with which the doctors testified this man was afflicted, the disabling factor is the pain suffered, and doctors in this type of disease must depend very largely upon the patient to determine the amount of pain. We are unable to conclude that a man who could and did voluntarily do the things which Mr. Cleveland admittedly has done during the period he claimed to have been totally disabled, was so afflicted with pain as to incapacitate him from following, with a reasonable degree of success, some occupation or gainful pursuit within the range of his normal capabilities.

We feel that to hold in this case that respondent was totally disabled would be to extend the rule far be-

yond that announced in the *Storwick* case, *supra,* and that we are not inclined to do.

Respondent cites several cases, among them *Lincoln v. New York Life Ins. Co.,* 192 Wash. 507, 74 P. (2d) 14; *Madison v. Prudential Ins. Co.,* 190 La. 103, 181 So. 871; and *Equitable Life Assurance Society v. Serio,* 155 Miss. 515, 124 So. 485. We have read these cases, and do not disagree with the decisions therein, but we are of the opinion they may be distinguished on the facts.

May we say in conclusion that we agree with the statement made in *Equitable Life Assurance Society v. Serio, supra,* that "total disability" should not mean "utter helplessness," nor "permanent disability" be held to mean "utter hopelessness," and we do not desire to be understood as holding that such conditions must be shown to exist before an assured may recover under a total disability clause such as the one here involved.

The judgment of the trial court is reversed, with instructions to enter judgment dismissing the action.

ROBINSON, C. J., BEALS, BLAKE, and SIMPSON, JJ., concur.