[No. 29183. Department Two. March 17, 1944.]

ALBERT KUHNLE, *Respondent*, v. THE MUTUAL LIFE
INSURANCE COMPANY OF NEW YORK, *Appellant*.[1]

*Evans, McLaren & Lane* (*Louis W. Dawson* of counsel),
for appellant.

*Phil K. Eaton,* for respondent.

ROBINSON, J.—This is an action for the recovery of total
permanent disability benefits, under a life insurance policy
issued by the appellant on December 2, 1921, to Albert
Kuhnle. The accident alleged to have caused total disability
occurred April 16, 1935. A claim was made against the
appellant insurance company in May, 1936, and was rejected
by it in November, 1936. This action was not brought until
May, 1942. In the meantime, the respondent continued to
pay his premiums in full. The benefits which the policy

[1] Reported in 147 P. (2d) 281.

provides if total permanent disability be established are thirty dollars per month and a waiver or remission of the annual premium of the policy of $71.73 during. the period of disability. Of this amount, $4.05 represented the charge for the disability benefits. The object of this action was to establish a status of total permanent disability within the terms of the policy, and to recover thirty dollars per month from May, 1936, to date of trial (February, 1943) and the annual premiums paid for six years (1936-1941, inclusive).

The appellant joined issue on the question of total disability and pleaded estoppel as an affirmative defense, based upon the fact that the respondent had, without objection or protest of any kind, continued to pay premiums for six years after his claim, that he was no longer liable therefor, had been rejected. Respondent admitted the factual allegations of this affirmative defense.

The respondent was born in Germany in 1894, and came to this country as a boy. He spent a year and a half in California, and came to Washington in 1909. He had no schooling in this country, can speak and read English, but cannot write, except his own name. From 1909 until his injury in 1935, a period of twenty-six years, he worked in the woods as a rigger, hook tender, and for a time supervised a logging camp. Being under the workmen's compensation act, he had, by the time this case was tried, received from his industrial insurance claims $8,440, and is still receiving a pension of seventy dollars per month. He also received eight hundred dollars from a group policy furnished by his employer, the Simpson Logging Company.

His industrial insurance was not recovered without litigation. Phases of the matter have been before this court on two occasions: *Kuhnle v. Department of Labor & Industries,* 12 Wn. (2d) 191, 120 P. (2d) 1003, and *Kuhnle v. Department of Labor & Industries,* 15 Wn. (2d) 427, 130 P. (2d) 1047. The second of these cases may be disregarded. The first seems to have had an effective, but, we think, an unjustifiable, influence upon the trial court's decision in this case.

The action was tried by the court without a jury. At the close of the trial, the trial judge took the matter under advisement, and, in due course, filed a memorandum decision in which he stated that he was of the opinion that the respondent was not wholly disabled, but that he would be compelled so to hold by two decisions of this court. The memorandum decision is short and may be quoted in its entirety:

"After carefully reading the excellent briefs written by counsel on both sides and considering the evidence which I heard at the trial, I am of the opinion that the case of Storwick vs. Reliance Life Ins. Co., 151 Wash. 153, is still the law of this state and controlling in this case.

"I tried the Industrial Insurance case of Kuhnle, the plaintiff. At that time I was of the opinion he was not totally disabled. This case was appealed to the Supreme Court. The Supreme Court reversed the case and held that he was totally disabled and allowed him a pension. I am still of the opinion that he is not totally disabled, but I am controlled by the Storwick case.

"Judgment will be for the plaintiff."

The appellant promptly filed a motion "for judgment notwithstanding memorandum decision of the court." There was attached to the motion, and is made a part of the record, a brief contending that this court has never held that the respondent was totally disabled, and that the instant case is readily distinguishable from the *Storwick* case. The trial judge filed another memorandum decision denying the motion, stating that, "after duly considering the same I am still of the opinion which I had at the time I decided this case." He then entered judgment for the plaintiff in the sum of $3,735.81.

The recital in the memorandum decision that this court held that the respondent was totally disabled can only have reference to the first of the *Kuhnle* cases, above cited. That case came to this court in the following manner: Kuhnle, being dissatisfied with a partial disability award of the department of labor and industries and claiming total permanent disability, appealed to its joint board. It affirmed the

decision of the department. He then appealed the matter to the superior court of Grays Harbor county and demanded a trial by jury. That court sustained a challenge to the sufficiency of the evidence to warrant submission of the case to the jury, and a judgment of dismissal was entered. The matter was then appealed to this court. Our opinion in the case opens by saying:

"The question raised by this appeal is whether or not there was evidence that claimant was totally disabled, warranting submission of that question to the jury."

We then quoted the following rule from *Alfredson v. Department of Labor & Industries,* 5 Wn. (2d) 648, 105 P. (2d) 37:

"If the evidence introduced at the hearing before the joint board offers room for a difference of opinion in the minds of reasonable men, then the case must be presented to the jury."

We then stated the evidence most favorable to the appellant, for, when such a challenge is made, that is the only evidence which is really material, and, having done so and having discussed the *Storwick* case and other pertinent decisions, rendered our decision, as follows:

"Applying these principles, we think there was sufficient evidence in the record to justify submission of the case to the jury, and that the court erred in deciding, as a matter of law, that claimant was not permanently totally disabled.

"The judgment appealed from is reversed, and the court below is directed to grant appellant a new trial."

Clearly, we made no decision on the merits. We held no more than this, that, accepting the evidence favorable to Kuhnle and disregarding evidence to the contrary, reasonable men might believe that he was totally disabled.

We are required to inquire further as to what effect, if any, the decision in that case should have on the decision to be made in this; for, under a caption in respondent's brief, entitled "Law of the Case," it is said:

"We contend that the law of this case is decided by the respondent's former case, *Kuhnle v. Department of Labor and Industries,* 12 Wn. (2d) 191."

Surely, it is not meant that that case established the law of this case, as the term "law of the case" is understood in legal parlance. The parties to the two cases are not the same. The rights asserted in the two cases are not the same. In the case cited, the plaintiff asserted a right created by statute. In this, he is merely attempting to enforce a contract. Even if respondent means only that the general principles of law announced in that case are determinative of the question raised in this, the statement is inaccurate because a general statement of the law in an opinion must always be considered in the light of the facts then before the court.

The evidence before the court in this case is very different from the evidence in the *Kuhnle* case, reported in 12 Wn. (2d). The evidence in that case was the testimony taken before the joint board. It completed the taking of that testimony on September 18, 1938. Much of the evidence in this case, and, indeed, almost all of the evidence upon which the appellant places its greatest dependence, relates to matters and things which occurred after September 18, 1938. For example, there is proof that, when applying for a license to operate a truck, the appellant made oath on March 27, 1939, that he had full use of his arms and legs, and had never been afflicted with "dizzy spells." There is testimony also that he conducted a log hauling operation, driving a large truck and trailer himself, and alone, on one-half of the trips, of which there were 573 in all. This occurred during the latter part of 1940, and during all of 1941. This matter will be discussed later in more detail. We refer to it at this point merely to show that it could not have been considered in the *Kuhnle* case in 12 Wn. (2d), since the last of the evidence in that case was taken in September, 1938. That case has the same claim to consideration in this case as any other case which deals with the legal principles which govern the determination of total disability, and no more.

We come now to the more serious question involved. If the respondent was not totally disabled, the case should have been dismissed. The trial judge, after hearing all of

the evidence, said that he did not believe that respondent was totally disabled, but gave him judgment after indicating that he did so wholly on the compulsion of the court's decision in *Storwick v. Reliance Life Ins. Co.*, 151 Wash. 153, 275 Pac. 550. The trial court correctly says, in its memorandum decision, that this case is still the law of the state. It has been cited and quoted in many of our opinions, and in at least one handed down since the trial court's memorandum was filed, *Shockley v. Travelers Ins. Co.*, 17 Wn. (2d) 736, 137 P. (2d) 117. In no instance has its soundness been questioned, although, in an opinion filed a year or two ago, it is said:

"We feel that to hold in this case that respondent was totally disabled would be to extend the rule far beyond that announced in the *Storwick* case, *supra*, and that we are not inclined to do." *Cleveland v. Sun Life Assurance Co.*, 13 Wn. (2d) 318, 343, 125 P. (2d) 251.

If one of the results of the opinion in the *Storwick* case is to force insurance companies to pay total disability benefits to persons who are not, in fact, so disabled, it will be clearly our duty to at once reverse or modify it. The importance of the matter far transcends the instant case; for it has long been settled by both statute and case law that the insurance business is affected with a public interest. The payment of unjust claims by an insurance company is a detriment to the public whether made by mutual companies or stock companies; for, in the long run, the amount of losses which insurance companies are compelled to pay must determine the premium rates which the public must pay for insurance protection.

We now proceed to an examination of the *Storwick* case, 151 Wash. 153, 275 Pac. 550. In this case, also, this court did not find that the claimant was totally disabled. A jury did. The insurance company appealed. We quote various excerpts from the opinion:

"The principal contention here made in behalf of the company is that Storwick was not totally disabled, within the meaning of the policies, and that the trial court erred in refusing to so decide as a matter of law in response to ap-

propriate motions made in that behalf by counsel for the company." (p. 157.)

That but one answer could have been made to that contention may be shown by a few excerpts from the five full pages of evidence quoted in the opinion. Storwick himself testified as follows:

"I fall right over, just the same as if someone hit me in the head, sometimes, just like you took a sharp file and dug it in you know, and it eases up for a minute; and it causes me dizziness; I cannot hold myself. If I don't get in a chair, I fall over. I have got to steady myself, and brace myself up again. Q. How frequently do you have such attacks as that? A. Oh, I have them frequently. I could say, continuously, practically. Q. Can you tell when they come? A. I cannot tell. They come practically all the time. . . . Q. Have you worked any since your injury? A. No, sir. Q. Have you been able to work since your injury? A. No, sir. Q. Have you been able to do any kind of work at all? A. No."

His wife testified: "Q. Has he done any work since he was hurt? A. No."

We find in the opinion the following statement by the court: "There was abundant evidence of his skull having been fractured and his brain being injured."

This statement is fully borne out by the five pages of medical testimony quoted in the opinion. Before quoting excerpts therefrom, it may be noted that Storwick had, in his lifetime, followed but two occupations, one as a seaman, the other as a stevedore. Dr. Smith, under whose observation he was from the time of his injury until the time of trial, testified, in part, as follows:

"Q. Do you notice any change in his personality? A. Yes. Within the last year, or the last fourteen months, there has been a marked change in his mentality. Q. Will you explain to the jury what it is? A. Well, he is quite excitable; does not take anything to get him riled up and excited, when he goes off the handle. When he was in the office the other day, I was discussing his symptoms, and so forth, with him; and he got quite angry at me; and he threatened to tear the office up; and he banged his fist on the desk, and talked loud enough so you could hear him clear out in the recep-

tion room. Prior to that, he was very quiet. . . . Q. Is he able to do manual labor involving physical efforts? A. I do not think he is able to do or perform manual labor."

Dr. Loe, who had been his family physician for a number of years, testified, in part, as follows:

"Q. Did you detect yourself the change in his mental condition and his nervous condition? A. Yes. Q. Just explain to the jury what you saw. A. Well, he was very nervous and irritable; and he complained of being dizzy, and of pressure on top of the head; and he also complained of pain on the top of the head. Q. Had he been nervous and irritable before? A. No. . . ."

He expressed the opinion that he was not able to carry on the work of a seaman or stevedore. Continuing, he testified as follows:

"Q. What about his ability to direct other men who may be working in such capacity? How in your opinion, if at all, is his mental stability affected by that? A. I do not think he is mentally stable enough to do that kind of work. Q. What have you to say about his ability to do hard manual labor? A. Well, I do not think he is physically fit for hard manual labor. . . . Q. Well, do you believe that he is suffering from brain pressure? A. I believe he is suffering from pressure due to the fracture. Q. And is vertigo common or uncommon in such cases? A. It is not uncommon."

Dr. Swift, a brain specialist, had examined Storwick seven times, or, as he said, about every three months during the two years before trial. He testified, in part, as follows:

"A. When he first came in, he seemed to be suffering more or less from headaches; and he improved for a while; then the mental condition began to predominate. All of his physical signs and symptoms had disappeared, practically, as far as I could tell, but he developed a marked emotional instability. He used to have control of himself on all occasions; but he has had three or more brainstorms in my office. . . . Q. Is that change in mentality indicative of emotional instability? A. That is one of the changes that we look for in anyone who suffers a severe concussion of the brain. Q. What have you to say about the permanency of that change? A. I think it will gradually get more and more pronounced. Q. You think he will get worse instead of better? A. The history of these cases is that in from

three to five years, he will become more or less greatly permanently unstable. . . . I do not think this man is capable of doing any work that will require him to pass judgment on anything, no matter how small it is; no matter whether it is running a ship, or loading vessels, or anything that requires mental processes operating, he cannot do that; he will go into a brainstorm and break.  Q.  What about his ability to perform hard manual labor?  A.  I don't think he can do it.  Q.  What would be the effect of that upon him?  A.  He will deteriorate more rapidly."

The decision of the question raised in the *Storwick* case was made by the court in the following sentence:

"We are of the opinion that we would not be at all warranted in disturbing the verdicts and judgments upon the ground that they are not supported by substantial evidence."

It is clear that no other decision was possible.  It must, therefore, be the principle of law laid down in the *Storwick* opinion which induced the court to render judgment for the respondent, though believing that he was not, in fact, totally disabled.  After the consideration of many decided cases, the court laid down the following rule of law:

"It seems to us that one is totally disabled, within the meaning of these policies, when he is so far disabled that he cannot, with any degree of success, within the range of his normal capabilities, earn wages or profit in some occupation or gainful pursuit."

That this is the rule of law of the *Storwick* case has been repeatedly recognized by its quotation in many later opinions.  One, discussing the case at length and quoting the above rule with approval, has been handed down since the trial court filed its memorandum decision.  In the opinion in that case (*Shockley v. Travelers Ins. Co.*, 17 Wn. (2d) 736, 137 P. (2d) 117), it is pointed out that, broadly speaking, total disability clauses may be divided into two general classes, those which define a total disability as one which prevents the insured from performing all the substantial and material acts necessary to the prosecution of the occupation or business in which the insured is customarily engaged, while the other class contains the added limitation

that the insured must also be unable to engage in any occupation for gain or profit. This distinction has also been pointed out in *McKillips v. Railway Mail Ass'n,* 10 Wn. (2d) 122, 116 P. (2d) 330. There, the court said, in part:

"Some policies of insurance afford a more liberal measure of protection than others. Such policies cost more by way of premiums or assessments than policies affording a more limited coverage. Under the weight of authority, one claiming under an insurance policy which protects against disability from 'carrying on any work,' or engaging in 'any business' or 'any occupation,' must show as part of his case that he is unable to engage in business or procure employment, as described in the policy."

The court further pointed out in the *Shockley* case that the rule laid down in the *Storwick* case is the settled law of this jurisdiction pertaining to that class of policies. The policy sued upon in this case is of that class. For the consideration of an annual premium of $4.05, the company agreed that, if, before the age of sixty years, the policy being in full force and effect, Kuhnle should furnish due proof:

"(a) that he has become totally and permanently disabled by bodily injury or disease, so that he is, and will be, *permanently, continuously and wholly prevented thereby from performing any work for compensation, gain, or profit, and from following any gainful occupation,* . . . The Company will, during the continuance of such disability, pay to the Insured a monthly income at the rate of ten dollars for each one thousand dollars of the face amount of this Policy, . . ." (Italics ours.)

That is to say, since the policy was for three thousand dollars, thirty dollars per month. The company further agreed that it would waive the payment of all premiums on the policy during the continuance of such disability, but it was provided that, if, during that period, it should appear to the company

". . . that the Insured is able to perform any work or follow any occupation whatever for compensation, gain or profit, no further premium shall be waived and no further income shall be paid."

Another quotation from the *McKillips* case is applicable to the situation here presented:

"The language of the paragraph providing for benefits in case of permanent disability, while not referring to the insured's ordinary occupation, makes it a condition of liability under the policy that the insured shall be wholly incapacitated from performing any labor or following any occupation. This language is plain and unambiguous, and the courts have no authority to enlarge appellant's liability under its contract beyond the plain terms thereof. As stated by the circuit court of appeals, in *Metropolitan Life Ins. Co. v. Foster,* 67 F. (2d) 264:

" 'The parties were free to contract for any risks they chose, adjusting the premium charge to the risks assumed. . . . We have no more right to enlarge the liability by artificial construction of the policy than to increase the penalty of a bond or raise the face of a promissory note.' "

Since the respondent had the affirmative of the issue, and the *Storwick* case is, as the trial judge observed, still the law of this state, the question presented for our decision may be stated, as follows:

Did the plaintiff (respondent) establish by a preponderance of the evidence that, during the period involved, May, 1936,—August, 1943, he was so far disabled that he could not, "with any degree of success, within the range of his normal capabilities, earn wages or profit in some occupation or gainful pursuit"?

On his direct examination, respondent testified that he had been subject to "dizzy spells" ever since his injury in 1935, and that, since that injury, he was unable to use his hands or arms effectively, except for short periods of time. Similar evidence was given by his daughter and by one or two other witnesses. It is difficult to rebut testimony of that character. However, there is in the record a photostatic copy of respondent's application for a motor vehicle operator's license which shows that he took oath, on July 31, 1937, that his answer "No" to the following question was true and correct: "Have you ever been disabled or had any disease which would prevent you from operating a motor vehicle safely?"

There was also in the record a photostatic copy of a similar application, signed and sworn to by the respondent on March 27, 1939, which shows, among others, the following questions and respondent's answers thereto:

"8. Do you have full use of your arms and legs? Yes.

. . .

"10. Have you ever been afflicted with . . . dizzy spells? No."

When confronted by these exhibits, the respondent made an evasive attempt to question his signature thereto, saying: "I don't know who forged my name."

"Q. It is your signature isn't it Mr. Kuhnle? A. I don't believe I can write like that nowadays. That is my signature. Q. You say it is? A. I couldn't swear to it now, I wouldn't be sure. Q. Well, you did make application for a license to operate a truck didn't you Mr. Kuhnle; you had to? A. Yes. Q. And isn't this the application, or a photostatic copy of it as you signed it? Isn't that your signature on there, sworn to before the notary as your application? A. Is that my application? Q. That is what it says. A. I never thought I was that good a hand writer."

We may say that the signatures on these documents appear to us to be identical with his admitted signature on the claim made to the company in 1936, which document is also in evidence.

But one medical witness was called in support of respondent's case. His professional standing and qualifications as an expert are beyond question, and his opinion is entitled to respect. He first examined the respondent in 1938, again in 1942, and a third time on the day of the trial, although he said that that examination was not thorough. He testified that he found respondent's condition about the same in each instance. He complained of dizziness, headaches, and pain in his neck and left arm. The sensation in the upper extremities was lessened, and the grip in both hands poor.

"Q. What in your opinion is the extent of his physical capabilities at the present time? A. You mean in regards to work? Q. Yes. A. I don't think he could do much of anything. Q. Do you think that condition with him is permanent? A. Yes."

The appellant called no experts. In this connection, it is urged in respondent's brief that it was known to appellant that the respondent had been examined by a great many doctors when his claim was before the department of labor and industries, and that, since appellant did not call any of these, it must be presumed that their evidence would have been adverse. This is not a necessary conclusion. It appears that the appellant planned its defense on the theory that, if it were conclusively shown that respondent actually did a substantial amount of heavy work requiring strong arms and a good grip, any opinion that he could not do much of anything, however expert its source, would be conclusively rebutted.

In preparation for the trial, at some date not disclosed by the record, appellant subpoenaed the respondent to produce his financial records. The respondent, throughout the period involved, had operated a large farm, and had added 320 acres to it by purchase in 1942, although but sixty acres of that tract were cleared. He had also, for a period, been engaged in the operation of a beer hall or tavern at Montesano. He had manufactured, sold, and delivered, on a considerable scale, veneer blocks from timber which he had purchased on the stump prior to his injury. Later, he used a small International truck in hauling veneer blocks for others, and, still later, he engaged in a very substantial way in the business of hauling saw logs. He had kept bank accounts in three different banks. Very few of the records of these ventures were produced in response to the subpoena. The respondent testified that "three, no four" weeks before the trial, at any rate before he had received the subpoena, he had burned nearly all of his records.

The evidence of the respondent and of his daughter was that he was able to do but very little about the farm. He had ten children, seven still at home at the time of the trial. They did the farm work under his direction, looked after fifty or sixty head of cattle, and milked from seven to eighteen cows. Respondent did such chores as chopping wood or helping with the milking, or feeding the cows, but soon grew tired while attempting to do so. When asked

whether he operated a tractor which he bought after his injury, he replied: "I don't operate it any more than I absolutely have to myself." He testified (still on direct examination) that, in 1937, he bought a half interest in a "beer joint" in Montesano, called the Smoke Shop, and tried to tend bar.

"Q. And what happened? A. Well, I just couldn't do it, that is all. I made too many mistakes you know making change for instance. I noticed that mostly."

He sold out his interest in 1938 for the same price he had paid for it. In response to interrogation by his own counsel, he testified as follows:

"Q. Have you got any idea how much cash you took out of the business approximately? A. No, I don't. It seems to me around five or eight hundred dollars while I was in there, five or eight hundred dollars as long as I was in there. Q. And that was your share of the profits you think? A. Yes."

He then made a contract to furnish a quantity of veneer blocks, to be cut from standing timber which he had purchased prior to his injury. This contract was burned with the other records. In carrying out the contract, he hired help to cut and transport the blocks. We have no way of determining, with exactness, what profit he made on this venture, as all of the records pertaining to it were destroyed. Respondent, on cross-examination, testified as follows:

"Q. It is true, isn't it, that you made a profit out of the veneer block business? A. Yes, I made a good profit. Q. Have you any idea about how much profit you made out of that veneer block business? A. It seems to me right at that time I think I figured out around two thousand dollars."

In 1939, he engaged in the hauling of veneer blocks for others, using a Chevrolet truck.

"Q. Did you ever engage in work with that yourself? A. Well, I tried to drive it; I didn't have much success with it, so I let my brother-in-law drive it. Q. How didn't you have any success in driving it? A. Just couldn't drive it that is all. Too many breakdowns."

In 1939, he sold the Chevrolet truck and acquired a ton and a half International, which he used in hauling logs, driving it himself a part of the time.

"Q. How did you make out in driving the truck? A. Didn't do much. Q. I don't mean financially, I mean physically. How did you make out? A. Pretty good. . . . Q. You were able to drive it? Did it bother you any? A. Well, driving it for a few days when it was new you know. Q. I don't know whether you understood my question or not, my former question. How did you make out physically when you were driving the truck; that is were you able to drive it or not physically? A. No, I wasn't, — physically I wasn't able to drive it. Q. How did it bother you to drive the truck? A. Well, get dizzy like."

Nevertheless, sometime in 1940, he traded that truck in for a big six-wheel International, with a trailer, which enabled him to haul forty foot saw logs in the latter part of 1940 and during the year 1941.

"The Court: You drove it in 1941, the truck part of the time? A. I drove it part of the time. Q. And how did you make out physically driving that? A. Well, I just got them spells when I couldn't make it; I couldn't stand it. I had to either stay home or get somebody else to drive it. Maybe sometimes I thought I could make it and they would have to bring me home. I got them dizzy spells and I just had to stay right wherever I was, didn't make any difference. Q. You had the same difficulty with that that you had with the former truck? A. Yes."

He sold this truck in April of 1942, saying that he was running behind.

"Q. Well, how were you going behind? Give the reasons for it. A. Take the way everything, rubber rationing for one thing, labor went so high, parts went high, and big expenses, so I could see it was just too big an expense for the way I operated the truck. I couldn't drive it myself. You take a driver and you pay them for the work it is just —I couldn't see it. I was going behind so I couldn't make the payments, and I couldn't pay the driver, so I had to quit. If I could operate the truck myself well no doubt I could make it all right."

When it came to cross-examination, a great deal was learned regarding the International truck and trailer which.

he operated a part of 1940 and all of 1941. It came out that he went into business with it as a contract carrier. In order to so operate, he was required to secure a permit from the state department of public service. The appellant secured a copy of his sworn application for the permit from the department and put it in evidence. It shows that the truck had a gross licensed weight of twenty thousand pounds, and a trailer licensed for twenty-four thousand pounds; that is, the equipment was such as is commonly seen transporting great loads of saw logs over our western Washington highways. He made a contract with one Rambo, late in 1940, to transport logs from a logging camp a distance of twenty-five miles to a log dump at Shelton. On cross-examination, Mr. Kuhnle testified as follows:

"Q. Did you drive it alone on certain occasions? A. Yes. Q. How long did it take you to make that run, oh about how long, Mr. Kuhnle? A. It depended a good deal on how heavy a load you had. Q. Well, take a heavy load, how long would it take? A. I think around about four hours. Q. Suppose you had a light load, how long would it take you? A. Might make it in three hours, three hours and a half. Q. It would be between three and four hours with any kind of load you would have? A. Yes. . . . Q. Now, you would drive that truck quite frequently yourself didn't you during that year or whatever it was, hauling logs? A. *I don't think I drove it any more than half the time. I don't think I drove half the time.* Q. *Not over half the time?* A. *Not over half the time.* Q. *Are you sure about that Mr. Kuhnle?* A. *Yes.* Q. Am I clear on this: when you were driving you would be alone on the truck, that is right isn't it? A. Yes, sometimes maybe somebody rode with me. Q. Oh yes. I mean so far as operating the truck is concerned. A. Yes." (Italics ours.)

On cross-examination, the following testimony was elicited from respondent as to the road conditions encountered on these trips:

"Q. Now is there much hill climbing on that road getting down to Shelton and back? A. From the woods there is, yes. Q. Pretty well up in the foothills is it? A. (nodding head affirmatively) Q. How high up would you say it is? A. From where they load the logs it must have been around

two thousand feet, I don't know, maybe more. Q. I understand. Is the road pretty crooked? A. Yes. Q. And that part of the road is what, gravel road as you get further up in the foothills? A. Yes. Q. What condition was the road in when you were doing the driving? A. Well, sometimes it was in good condition, other times it was more or less in bad condition."

When he arrived at the dump with the logs, he took the chains or binders loose and knocked out the "cheese" blocks. Some days he drove this heavy equipment two round trips, on one occasion, three.

"Q. How many trips would you make in a day when you were driving? A. Well, I made one, two. The best I think once I made three. Q. You think you have made as high as three? A. I think I have; I am not sure. Q. Three. If it is twenty-five miles that would be one hundred fifty miles of driving in one day, wouldn't it? Isn't that right? A. Yes. Q. *And you would quite frequently make two trips? A. Yes, when I was driving, that is if I could make two I would, naturally. Q. Would you say when you were driving you would make two trips oftener than you would make one a day? A. Well, I don't remember that. I would have to look that up.*" (Italics ours.)

He was accustomed to leave home at five o'clock in the morning, and he operated under the conditions above described, according to his own testimony, about fourteen months. It seems that he discontinued his log hauling venture at the end of the year 1941. He sold the truck and trailer in April, 1942, and as to whether he engaged in any other venture before he brought this action a month thereafter, the record is silent.

It will be remembered that respondent testified, on his direct examination, that he discontinued his log hauling operation because it was unprofitable. He was running behind. He could not testify with definiteness as to this because he had burned his records. However, a contract carrier is required to make an annual report to the state department of public service, and appellant introduced in evidence a certified copy of respondent's report covering his operations from January 1, 1941, to January 1, 1942, sub-

scribed and sworn to by Mr. Kuhnle on April 15, 1942. This shows, under the caption "Operating expenses during period," that his operating expenses in 1941, including wages of driver, gasoline, lubricants, tires ($582.33), repairs ($830.61), depreciation of equipment ($840), amounted to $3,689.35, and, under the caption "Operating Income," we find $5,839.08.

We think this exhibit significant, in two ways. It shows that respondent, in the calendar year before he brought this action, made a profit in a log hauling operation of more than two thousand dollars, not by merely supervising the venture, but by actively participating in work so strenuous that the truck and trailer he drove (half time) depreciated in a single year more than $800, required tire replacements amounting to $582.33, and general repairs amounting to $830.61.

Due to the voluntary destruction of his records, Mr. Kuhnle was only able to estimate the number of trips he made in carrying on the log hauling operation. He said that he drove not more than half of the time. In this statement, he is corroborated by a witness called on his behalf, the driver he employed to substitute for him. He stated that Kuhnle drove about half of the time, but "not any more than that." Mr. Fettis, the only witness called by the appellant during the trial, had checked all log deliveries as they arrived at the Shelton log dump, and testified on this point as follows:

"Q. Can you tell us whether or not Mr. Kuhnle drove the truck a substantial portion of the time? A. Well, to the best of my knowledge I believe that Mr. Kuhnle drove his truck fifty per cent of the time."

Both of these witnesses explained that, if Kuhnle had kept the slips given to him when he delivered his loads, this matter could have been exactly determined. As it is, since Kuhnle estimated that he drove one-half of the time, and his estimate is confirmed by two other witnesses, that figure must be accepted. However, Mr. Fettis was able to testify from his records, and a transcript thereof is in evidence, that the number of trips actually made was 573. Mr. Kuhnle,

therefore, drove the truck and trailer on at least 286 of the trips, and, since each round trip was fifty miles, he drove 14,300 miles, and of this amount 7,150 miles when the truck and trailer was loaded with logs.

In the quite recent opinion in *Cleveland v. Sun Life Assurance Co.*, 13 Wn. (2d) 318, 125 P. (2d) 251, wherein the policy provisions as to total liability benefits were the same as in this case, we held that the plaintiff was not totally disabled, although there was no evidence that he had earned any wages or profited in any gainful pursuit. He had, however, made a long and leisurely pleasure trip over the paved roads which gridiron our eastern states, and, although the trip was made in a new automobile, especially selected for its easy riding qualities, the evidence that he alternated in driving it was a factor, and, perhaps, the major factor, in inducing the court to hold that he was not totally disabled.

When we consider the size of the truck and trailer, even when not loaded, and the nature of a logging road, for nine miles of the road, as we understand the respondent's own evidence, was a mere logging road, curving and twisting over so rugged a terrain that in some places it reached an elevation of two thousand feet, and further consider that the respondent drove this massive equipment over that road many times fifty miles per day, often a hundred, and sometimes one hundred and fifty, we, like the trial court, cannot believe that he was totally disabled.

The *Storwick* case did not prevent the trial judge from entering a judgment in accordance with his belief. At any rate, it clearly requires us to reverse the judgment entered. The evidence does not show that the respondent met the burden, as that case requires, of showing that he

" . . . is so far disabled that he cannot, with any degree of success, within the range of his normal capabilities, earn wages or profit in some occupation or gainful pursuit."

His own evidence, as given orally at the trial, coupled with written statements on documents sworn to by him, as shown by the exhibits from the files of the state license department

and the state department of public service, shows, not only that he was able to do so, but also that he has done so. He received a profit from the Smoke Shop venture in 1937 and 1938 of from five hundred to eight hundred dollars, and, in 1938 and 1939, a profit of two thousand dollars by converting some timber into veneer blocks. As to whether he made any profit or not on hauling veneer blocks for others immediately thereafter in 1939 and 1940, the record is silent. Nor is there any evidence as to whether he made a profit or not from his log hauling operation in 1940; but there is convincing evidence that he made a profit in excess of two thousand dollars in conducting that operation during the year 1941.

In addition to what has already been said, it appears that it was not until after respondent became totally disabled that he earned sufficient to require him to file a Federal income tax return. He did so in 1941 and 1942. Copies of these returns are in the record. That for the year 1941 is of especial interest because it shows, under "Net Profit (or Loss) from Business or Profession—Logging, $1,643.17." We assume that, by characterizing his business or profession as "logging," he referred to the log hauling he did that year. This differs from his report to the department of public service. There, the amount is shown to be $2,149.73. It is true that he paid no Federal income tax on either return, but this was principally because he was able to deduct from his net income $4,300, the same representing his personal exemption and credit with respect to children under eighteen.

In view of the fact that we find that the respondent was not totally permanently disabled, within the terms of the policy, it becomes unnecessary to discuss the questions raised with respect to the respondent's affirmative defense.

Since the only medical expert called in the case testified that respondent's physical condition at the date of the trial (February, 1943) was substantially the same as it was in 1941 and in 1938, and there is nothing to indicate that it differed in 1936 or 1937, or at any time during the period in-

volved, we hold that the respondent was not entitled to a recovery in any amount, and accordingly:

The judgment appealed from is reversed and the cause dismissed.

SIMPSON, C. J., MILLARD, GRADY, and MALLERY, JJ., concur.