## HUGHES v. MUTUAL LIFE INS. CO. OF NEW YORK.
### No. 12202.

United States Court of Appeals
Ninth Circuit.

Feb. 3, 1950.

Laney & Laney, Grant Laney and Lynn M. Laney, Phoenix, Ariz., for appellant.

Evans, Hull, Kitchel & Jenckes, Norman S. Hull, Phoenix, Ariz., for appellee.

Before GOODRICH and POPE, Circuit Judges, and HALL, District Judge.

POPE, Circuit Judge.

In 1923 the appellee insurance company issued to the appellant Hughes a policy of life insurance which provided for waiver of premiums, and for payment to him of monthly sums in the event that he became "totally and permanently disabled by bodily injury or disease, so that he is, and will be, permanently, continuously and wholly prevented thereby from performing any work for compensation, gain or profit, and from following any gainful occupation. * * *"

In 1932, and again in 1935, Hughes received serious injuries to his spine. Following the second injury, when his back was broken, he developed chronic multiple hypertrophic arthritis, which his doctor testified was continuing to get progressively worse. From 1935 to 1942 the company waived his premiums and paid him the monthly income stipulated in the policy, and then discontinued the payments and the premium waivers claiming that Hughes was not totally and permanently disabled within the meaning of the policy. Thereafter Hughes paid the premiums under protest,

and then brought this action in the Superior Court of Arizona, where Hughes resided, to recover the accumulated monthly income payments alleged to be past due, and for a return of the premiums paid under protest. The insurance company, a New York corporation, removed the case to the court below on the ground of the diversity of citizenship of the parties.

Upon the trial the court granted defendant's motion for a directed verdict, made at the close of plaintiff's evidence, and entered judgment for the defendant insurance company, from which this appeal is taken. The single specification of error relates to the court's action in taking the case from the jury.

The dispute between the parties centers about the fact that while Hughes, a farmer, suffered great physical disability which prevented him from working in the fields, or doing ordinary physical work about his farm, he continued to manage the farm through a foreman, directing its operation, keeping the books and records, and personally writing checks for the payment of the bills and expenses.

From the evidence the jury would have been justified in finding that Hughes, whose only occupation had been that of farmer, was since 1935 wholly unable to be about upon his land, or personally to do any of the farm work. Any physical work on his part caused extreme pain, and often put him in bed. The doctor testified that any such exertion aggravated his condition and hence he had directed his patient to refrain from physical activity because of its harmful effect.

Before his injuries in 1932 and 1935 Hughes had done all of the farm work himself with the aid of one hired man. He operated the farm machinery, did the irrigating, the milking, the haying, the plowing, and other similar tasks. After the onset of the arthritis, he was unable to walk out in the fields to direct the hired hands, or to do any of the milking or the field work. He could not get into the fields to inspect the crops or to determine when work of various kinds ought to be done. It was testified that in order to supervise the ranch properly it is necessary to be able to get about in that manner, but that Hughes was unable to do so. On one occasion he undertook to run the tractor long enough to show an employee how it operated, and the exertion put him in bed. After describing Hughes' physical condition his physician testified as follows: "Q. Then, Doctor, if we define total disability as such disability that renders a patient permanently unable to perform substantial and material acts of his occupation, or any other occupation in the usual and customary manner, I will ask you whether in your opinion this patient is totally disabled? A. Yes, I'd say that he is permanently disabled, completely disabled under that definition."

At the time in question his farm ownership covered 412 acres; 185 acres he leased to a lettuce company; the balance was in grain and alfalfa which was fed to a dairy herd of 55 or 60 milking cows, with additional head of young stock. This was accomplished through the employment of a foreman, who generally, as Hughes put it, "goes right along and runs the ranch just the same as if I wasn't there." Hughes also employed a man to milk the cows and handle the dairy. At this time, also, a considerable portion of the farm work was done by others under contract. This was true of the hay cutting, the baling, hay hauling, plowing, disking and sub-soiling. These were operations which Hughes did himself, with his own equipment, prior to his disability. Nevertheless, the farm operations during the six years here in question were more profitable than those in the period before his injuries. He explained this as being due to the greatly increased prices of farm products during the later years.

Hughes lived on the ranch. Although he had once attended a normal school as a young man, then intending to become a teacher, he had never had a teacher's certificate or done any teaching, but his principal occupation had been that of farming. Notwithstanding his physical disabilities, he did most of the book work connected with the ranch operations, made the bank deposits, wrote the checks, and made the entries in the books of account. He arranged for the cutting of the hay which was done by contract, he purchased parcels of land,

executed purchase-money mortgages, negotiated and signed leases with the lettuce company which worked part of the land. He sold hay and grain produced on the ranch, negotiating the sales himself. He paid the irrigation water assessments, occasionally borrowed money from the bank, for which he executed notes, and purchased machinery and supplies for the ranch.

Hughes also had some other interests and activities during this period. He was administrator of an estate. He testified that the attorney for the estate did substantially all of the work required during the administration. He was a member, and at the time of the trial president, of the local school board. He performed all the duties of a board member, attending most of its meetings, many of which were held at his home on account of his difficulty in getting out. For sixteen years he was a member of the governing board of his Water Users Association. He was chairman of the board for a number of years. In 1942 he made a trip to Washington, D. C. to represent the board on business growing out of a controversy between the board and the government. He spent several days in Washington, but became ill on the way home and stopped in Kansas City for two weeks where he was sick in bed.

The position of the insurance company, upon which it prevailed in the lower court, is that upon the case as made by the plaintiff, Hughes was not prevented from *managing* his farm, that he did in fact perform a substantial amount of work, of a managerial and executive character, that therefore he was not prevented "from performing any work for compensation, gain or profit" or "from following any gainful occupation".

Appellant Hughes contends that since he was unable to perform any of the physical activities commonly connected with farming, it must be said that a jury might well find that he was unable to perform the substantial and material acts necessary to the prosecution of a business or occupation in

the usual or customary way, and that therefore the evidence presented a question of fact which should have been submitted to the jury.

■ Both parties cite numerous cases in support of their respective positions. The record contains no specific evidence as to where the policy was delivered. It appears to have been signed on behalf of the company by its president and secretary, presumably at the home office in New York. The application for it, which is attached to the policy, provides: " * * * The proposed policy shall not take effect unless and until the first premium shall have been paid during my continuance in good health, nor unless also the policy shall have been delivered to and received by me during my continuance in good health. * * * " At the time the policy was issued Hughes was a resident of Arizona. The Arizona law then provided that "No foreign company shall make, write, place or cause to be made, written or placed in this state any insurance policy or contract unless through its duly authorized agents, residents of this state * * * " Laws 1915, ch. 58, sec. 2, Arizona Code, 1939, sec. 61-332. We think it may be inferred that the policy was delivered to Hughes in Arizona by an agent resident in that State, and hence that it is an Arizona contract, and its construction to be determined under the laws of that state. Ruhlin v. New York Life Ins. Co., 3 Cir., 106 F.2d 921; Mutual Life Co. v. Johnson, 293 U.S. 335, 55 S.Ct. 154, 79 L.Ed. 398. There is also indorsed on the margin of the policy a clause made mandatory by the law of Arizona, which indicates that it was contemplated that the policy was to be governed by the law of that state. Both parties agree that it is the law of Arizona which must determine the issue between them.

■ An examination of the statutes and decisions of Arizona yields no solution here. Although problems similar to that here presented have been dealt with in a great number of decisions in many states,[1]

1. See annotation and collection of cases in 149 A.L.R. 9, 153 A.L.R. 430; also notes in 24 A.L.R. 203, 37 A.L.R. 151, 41 A.L. R. 1376, 51 A.L.R. 1048, 79 A.L.R. 857 and 98 A.L.R. 788.

there appears to be no Arizona decision in point.[2] We are therefore called upon to determine, as best we may, what the Supreme Court of Arizona would hold if confronted with the controversy now presented to us.

The cases which deal with the meaning of disability clauses substantially the same as that contained in the policy before us, fall into three groups. The first is illustrated by the case of Thigpen v. Jefferson Standard Life Ins. Co., 204 N.C. 551, 168 S.E. 845, 847. In that case, the insured, a farmer, after suffering a stroke of paralysis, was mentally and physically unable to attend to his farm and gave it up. He was appointed a court crier for the county court at a salary of $40 per month, and although there was testimony that he was unable to perform the duties of that office, yet he was always present, and he drew the pay. The court held that the claimant could not recover, saying that "the ultimate question is whether the infirmities and disabilities of the insured wholly prevented him 'from pursuing any occupation whatsoever for remuneration or profit.' " It was held that the entry of a nonsuit was proper. The court relied upon its earlier decisions, including Buckner v. Jefferson Standard Life Ins. Co., 172 N.C. 762, 90 S.E. 897, in which it had said " * * * Plaintiff cannot recover without showing a bodily injury that will incapacitate him, not only from following his usual avocation of fireman, but also from pursuing any other gainful occupation. The language is too plain, and the meaning too unmistakable, to permit an enlargement of the terms of the contract by construction. It is unfortunate for the plaintiff, but 'it is so nominated in the bond.' "

It is apparent that these decisions are based upon a strict and literal construction of the policy. Many cases may be found in accord. Such cases have been vigorously criticised. Thus, in Fogelsong v. Modern

Brotherhood, 121 Mo.App. 548, 97 S.W. 240, at page 241, the court said: "Common knowledge of the occupations in the lives of men and women teach us that there is scarcely any kind of disability that prevents them from following some vocation or other, except in cases of complete mental inertia. We have examples of persons without hearing and without sight following a vocation—some without feet, and some without hands, engaged in business. The achievements of disabled persons are seemingly marvelous. Under defendant's theory, the plaintiff might embark in the peanut trade or follow the business of selling shoestrings or lead pencils, or follow some similar calling; in which instances, under the rule invoked, there would be no disability within the meaning of the policy. In our opinion, such was not within the contemplation of the parties. In order to carry out the intent of the parties, it is our duty to disregard the broad language used which would have the effect to defeat the purpose of the contract and render it a nullity."

In that case, however, the court went to the opposite extreme of holding that all that claimant under such a policy need prove is his inability to perform the duties or labor pertaining to his particular occupation. There the claimant was a farmer who after his claimed disability not only directed the work on his farm, but performed much of the labor himself. The case was held one properly for the jury, and the court said: "Total disability exists, although the insured is able to perform a few occasional acts, if he is unable to do any substantial portion of the work connected with his occupation."

Cases which apply this test have been criticized as confusing policies of the kind here involved with those which insure against disability to perform a particular occupation.[3]

---

2. In Equitable Life Assur. Soc. v. Boyd, 51 Ariz. 308, 76 P.2d 752, the question was primarily whether one who clearly became totally disabled, became so disabled before his policy had lapsed. The facts did not resemble those here.

3. "The effect of these decisions is to enlarge the insurer's liability to that which it assumes under a non-occupational [an occupational?] policy." Erreca v. Western States Life Ins. Co., 19 Cal.2d 388, 121 P.2d 689, 694–696, 141 A.L.R. 68.

Both parties here agree that the Arizona rule must be taken to be one which follows neither the so-called "strict construction" rule, nor the "particular occupation" rule, but what has been referred to as the "intermediate" rule. Appellee says that the test is "whether he can pursue, with reasonable continuity, his customary occupation or some other occupation for which he is qualified by education, station in life, age and physical and mental ability." Appellant states the same test as follows: "* * * the term 'total' disability' does not signify an absolute state of helplessness but means such a disability as renders the insured unable to perform the substantial and material acts necessary to the prosecution of a business or occupation in the usual or customary way." [4]

But, although both parties are in substantial agreement as to what the policy language should be held to mean, they draw opposite conclusions as to whether the facts developed by the plaintiff's evidence required submission of the case to the jury. Both are supported in their positions by decisions upon facts must the same as those shown here. Thus appellee points to the case of Ireland v. Mutual Life Ins. Co.,

226 N.C. 349, 38 S.E.2d 206. There, a farmer, afflicted with arthritis which prevented his doing any kind of physical farm work, and which disabled him so that he could not get out upon the farm to attend to it, nevertheless wrote and signed checks for the farm operations, made bank deposits, paid bills, executed notes for loans, purchased supplies, attended and participated in sales, and made trips in transacting business matters relating to the operation of his farm. A judgment upon a special verdict against the insurance company was reversed upon the authority of earlier North Carolina decisions, including Buckner v. Jefferson Standard Life Ins. Co., supra, and Thigpen v. Jefferson Standard Life Ins. Co., supra.

We think that if the law of Arizona is to be taken to be in accord with that of North Carolina, the decision in the Ireland case, supra, would compel an affirmance of the judgment here. But while the rule of that case has been declared in other jurisdictions, yet it must be noted that the decision was based upon the authority of the earlier cases in that state, which, as we have noted, adopt the "strict and literal construction" rule, which both parties here disclaim.[5]

Note Mutual L. Ins. Co. v. Bryant, 296 Ky. 815, 177 S.W.2d 588, 153 A.L.R. 422, overruling earlier decisions in accord with the Fogelsong case, supra.

4. Both of these statements of the so-called "intermediate" rule are found in Erreca v. Western States Life Ins. Co., supra, note 3.

5. Bulluck v. Mutual Life Ins. Co., 200 N.C. 642, 158 S.E. 185, 187: "North Carolina has been classified in the decisions of various courts as adhering to the strict construction of such contracts. This classification has resulted from the decision in Buckner v. Ins. Co., 172 N.C. 762, 90 S.E. 897, which has been cited in many jurisdictions."
An attempt to determine the rule enforced in any particular jurisdiction is likely to produce more confusion than enlightment. Thus in the Ireland case, supra, the court says that its earlier decision in Guy v. Aetna Life Ins. Co., 206 N.C. 118, 172 S.E. 885, is "distinguishable in factual situation". [226 N.C. 349, 38 S.E.2d 211] Such must have been apparent to the North Carolina court, but it

is not so clear to us. The case of Cleveland v. Sun Life Assurance Co., 13 Wash. 2d 318, 125 P.2d 251, upon which appellee also relies contains some language which appears to support appellee's argument. In our view the facts of that case, and of the later case of Kuhnle v. Mutual Life Ins. Co., 20 Wash.2d 255, 147 P.2d 281, differ greatly from those here. Some of that language is difficult to reconcile with what was said in Shockley v. Travelers Ins. Co., 17 Wash.2d 736, 137 P.2d 117, 123, where it was held that the fact that insured "could supervise the work connected with his orchard", still left the question one for the jury. The court quoted, as an applicable rule, its holding in an earlier Workmen's Compensation case, Kuhnle v. Dept. of Labor & Industries, 12 Wash.2d 191, 120 P.2d 1003, as follows: "This court held that although he was able to do some supervisory work around the farm, it was nevertheless a jury question as to whether he was totally and permanently disabled within the meaning of the Workmen's Compensation Act."

The California case of Erreca v. Western States Life Ins. Co., supra, note 3, presents a state of facts which also seems to us to be on all fours with those here. That was an action upon a policy containing substantially the same provisions here involved. There the plaintiff, a farmer, owned, leased and personally operated grain ranches containing 7,000 acres. He also owned a dairy ranch managed by a partner. After an accident he developed varicose veins, and open lesions on his legs required him to keep his legs constantly bandaged. His condition was described as follows, 19 Cal. 2d at page 392, 121 P.2d at page 693, 141 A.L.R. 68:

"In his present condition, he can perform no manual labor whatsoever. He is unable to walk over plowed ground, or to bend down upon his hands and knees and examine the soil. He cannot direct the plowing, planting, cultivating or harvesting of his land as he did before. He is able to drive an automobile and frequently rides to his farms, but he cannot approach the scene of the farm work, inspect the land, and directly superintend the conduct of the farming. In short, he can engage in no activity requiring any form of physical exertion. However, the accident has in no way impaired his mental faculties. He is able to negotiate leases, arrange finances for crops, buy supplies, and participate in the selling of his grain. Respondent's physician, Dr. Hillyer, testified that in his opinion respondent 'could perform all the secretarial work connected with the farm.'

"As a result of his disability, respondent has abandoned his management and control of his ranches to his son who is now acting as the sole overseer. Occasionally, he has conferred with his son regarding certain transactions incident to the operation of the farms, such as the kind of crops to be planted and the time and price for the selling of such crops. He has participated in the negotiation of certain leases, has signed notes, negotiated loans, talked to grain buyers, and has attended to the buying of hogs. The actual conduct and control of farm operations, however, has been completely left in the hands of his son."

We perceive only one difference between the situation of Erreca, in that case, and of Hughes in this. Hughes has done substantially all of the bookkeeping, check-writing, and other secretarial work required on his farm, while Erreca, it appears, had abandoned much of that to his son. But his physician testified that Erreca "could perform all the secretarial work connected with the farm." Since the question here is one of ability (or of disability), the fact that Erreca *could* do all the secretarial work is what matters, and hence we think this difference is without significance.

The California court held that the trial court's finding for Erreca was supported by substantial evidence, and judgment for him was affirmed. If the Erreca case were controlling here, it would compel a reversal of the judgment we now review. In our effort to determine what the Supreme Court of Arizona would hold in this situation, we are much impressed with the decision in that case. The scholarly opinion bears internal evidence that the facts and law involved had received the extended and thorough examination of an able court, after adequate presentation of counsel, and we think the Supreme Court of Arizona would be inclined to accept its reasoning as sound, and properly applicable here.

After stating what it called the "intermediate" rule concerning the meaning of the policy disability clause in the precise language which both parties have urged upon us here, the court stated that because of his age and previous training the insured probably could not prepare himself for other remunerative employment and therefore the question was whether he could pursue the occupation of farmer or farm supervisor.[6]

6. "The policy of insurance issued to respondent is clearly a non-occupational policy. He is not insured as a farmer or farm operator, for the disability clause explicitly conditions appellants' liability upon a total disability which prevents him

'from engaging in any occupation, or performing any work whatsoever for remuneration or profit. * * *' Nevertheless, and although respondent is a shrewd farm executive and a successful grain operator, the testimony discloses that he

It was pointed out that the insured could not supervise or manage farm operations as he did before. In the days before his injuries, "to properly supervise these operations, he was compelled to engage in activities requiring physical exertion." This involved being on the ground, testing the soil, watching the plow depth, following the harvesting machinery, and the like. After stating that proper farming "requires his personal direction at the scene of the farm work", the court said:

"Because of respondent's inability to walk over plowed or wet ground, or to bend down upon his hands and knees, he can no longer inspect his land nor supervise the many indispensable farm operations in progress, such as the plowing, planting, cultivating and harvesting. The insurer lays great emphasis upon the respondent's frequent trips to his ranches in his automobile, but the record does not show any accomplishments by these visits other than the satisfaction of his curiosity as owner or lessor. Furthermore, the evidence shows that the fields are not accessible to an automobile and the respondent therefore cannot approach the scene of farm operations and properly supervise the work in the required manner as above described. Secretarial work in connection with farm operations is unimportant.

\* \* \* \* \* \*

"True, since his injury, the respondent has negotiated loans and leases, signed notes and mortgages, talked with grain buyers, participated in the buying of supplies and occasionally talked with his son concerning farm operations. Although such activities are neither trivial nor inconsequential, they are the type of duties that are infrequently and intermittently performed and cannot be said to constitute the substantial and material acts of the occupation of farming. In its final analysis, the question of what amounts to total disability is one of fact (Sherman v. Continental Casualty Co., supra, [103 Cal.App. 518, 284 P. 946]; Ives v. Prudential Ins. Co., 12 Cal.App.2d 306, 55 P.2d 273), and where, as here, the finding of the trial court is supported by substantial evidence, it will not be disturbed upon appeal."

Other cases involving claims of disability on the part of farmers, which impress us with their well reasoned arguments in support of the rule stated in the Erreca case are Hoover v. Mutual Trust Life Ins. Co., 225 Iowa 1034, 282 N.W. 781; Atlantic Life Ins. Co. v. Worley, 161 Va. 951, 172 S.E. 168; Mutual Life Ins. Co. v. Dowdle, 189 Ark. 296, 71 S.W.2d 691; Raub v. Mutual Life Ins. Co., 126 N.J.L. 164, 18 A. 2d 37.

In the Hoover case, supra, the court adverted to one fact which could well be found here also. It said [225 Iowa 1034, 282 N.W. 784]: "It is obvious from the record in the case at bar that a jury could well find that it would be impossible for plaintiff to secure a position from anyone else to operate a farm under the physical condition which the evidence shows he was in since the beginning of 1937." This circumstance suggests an additional reason why the jury might find Hughes totally disabled. Management of one's own property or investments does not always rise to the dignity of a substantial "gainful occupation." [7]

As for Hughes' activities as a member of the school board and with the Water Users' Association, while they furnish circumstances properly to be considered by the

---

has had little formal education and is neither trained nor qualified for any other occupation. And because of his age and experience in life, he probably could not prepare himself for other remunerative employment. Accordingly, the respondent must be deemed to be totally disabled if he is no longer able to pursue the occupation of farmer or farm supervisor."

7. Among the conclusions from his review of cases made by the compiler of the note in 149 A.L.R. 7, is the following (p. 77): "(9) Where the wages or the profits which an insured receives constitute partly a return of his capital investments and are partly produced by his active management of the investments, the test of his total disability within the disability clause is whether he would be able to procure employment in the open labor market in the same capacity in which he is managing his investments."

jury, they are in no sense determinative of the issue. A per diem of $4.60 which he received for four or five meetings a year can hardly amount to enough to prove that he was in a "gainful occupation" within the meaning of the policy. The position may well be regarded by the jury as primarily honorary, and the duties no more than might have been performed by one permanently bedridden. And for the reason stated in the Erreca case, supra, we do not regard the fact of Hughes' income from his farm as being incompatible with total disability on his part.[8]

We are persuaded that the cases, holding that under circumstances like those here involved, the question of total and permanent disability within the meaning of such a policy is one of fact for a jury, follow the better rule. This is the rule which we think the Arizona court would adopt. We are therefore of the opinion that the lower court should not have directed the verdict upon which the judgment is based. The judgment is reversed and the cause is remanded with directions to grant the appellant a new trial.

HALL, District Judge.

I dissent.

The policy was issued to insure the appellant against his loss of earning capacity, in order that he might receive an income when "he *is,* and will be permanently, continuously and *wholly* prevented * * * from performing any *work* for compensation, gain or profit, *and* from following *any gainful occupation.* (Italics supplied.)

And I agree that these terms of the policy should be given a reasonable rather than a literal construction, as applied to the facts in the case at bar.

Those terms are clear and unambiguous. But even under any paraphrasing, or construction most favorable to the insured, I do not see how he is entitled to prevail upon the record in this case. I cannot read into the language of the policy an insurance against partial disability, or pain, or lessening of mere agility. And that is all the insured has shown, viewing the record in the light most favorable to him.

This is not a case where the insured has been forced to abandon his "gainful occupation" and compelled to prepare himself for some other means of earning a living, or of being forced to sell lead pencils, or earning the pittance of a bailiff, or the like. For that reason, the cases relied on in the majority opinion do not seem to be in point.[1] To go along with my brethren I would be forced to disregard what did happen and to speculate on what could have happened under a state of facts which does not exist from this record.

---

8. "The insurer also stresses the magnitude of the respondent's enterprise and his income therefrom. Such matters have no proper place in the determination of whether respondent is totally disabled from performing remunerative work. Disability insurance is designed to provide a substitute for earnings when, because of bodily injury or disease, the insured is deprived of the capacity to earn his living. * * * It does not insure against loss of income. The respondent receives his income from his ranches as an owner or lessor; his labor contributes nothing toward it. The contention of the insurer would lead to the strange conclusion that a bedridden merchant is not totally disabled from performing gainful work because he receives a substantial income from a business, the management of which he has been forced to abandon to others."

1. Erreca v. Western States Life Insurance Co., 19 Cal.2d 388, 21 P.2d 689, 141 A.L.R. 68, is particularly illustrative. The Court in that case repeatedly pointed out that the basis of its decision was that the insured had been compelled to *abandon* the management and control of his ranches. The following quotations are indicative.

19 Cal.2d at page 392, 121 P.2d at page 693. "As a result of his disability, *respondent has abandoned his management and control of his ranches to his son* who is now acting as the sole overseer."

19 Cal.2d at page 395, 121 P.2d at page 695. "Accordingly, the respondent must be deemed to be totally disabled if he is no longer able to pursue the occupation of farmer or *farm supervisor.*"

19 Cal.2d at page 396, 121 P.2d at page 695. "Admittedly, he can no longer do manual labor of any sort. *Nor can he*

The record shows that his income has increased while pursuing the same occupation he followed as before his arthritis; albeit he is not as agile or vigorous at 72 years of age as before, nor is he now able to do the manual farm labor he previously did. His income from farm management is, and was during the years in question from $16,000.00 to $19,000.00 a year, a not inconsiderable earning capacity. And any person who is able to do that in the management of a large farm and in a moderate dairying and cattle operation is inescapably engaged in a "gainful occupation." Although he does not now do the manual farm labor he did before, he does do the *work*, which is, and before his arthritis was, required to actively *manage* his own operation; in addition he has since also managed and supervised a forty acre farm of a nonresident sister, and continues to engage in community affairs of consequence as before. He has in fact increased his own acreage of farm land and his dairy herd. Such work of management cannot, in my judgment, be called mere secretarial work. Viewing the record as a whole and indulging all the presumptions in his favor as the Court must do on the motion under review, he can be said at best to be only partially disabled under any rule of construction of the terms of the policy, however liberal.

Nor do I think we are justified in laying down the rule in this case that a test of total disability, Hoover v. Mutual Life Insurance Company, 225 Iowa 1034, 282 N.W. 781, is whether or not the insured, considering his age, would be able to procure employment in the open labor market in the same capacity he is now engaged. It is pressing the realities of life too far to expect that a jury would find that even the most vigorous man at 70 would be hired by another at $16,000.00 to $19,000.00 a year to do the work required to actively manage farms and the like as done by the insured.

I agree with the majority that the law of Arizona should apply. But there is no adjudicated case by the Court of last resort in that State. And, inasmuch as we are

*supervise and manage farm operations* as he *did before*."

19 Cal.2d at pages 398–399, 121 P.2d at page 696. "The evidence in this case shows that the respondent was *unable* to *inspect* his lands, direct the labor in progress, or *perform any other essential supervisory functions*."

Particularly indicative of the fact that the California Court relied upon the abandonment of the management of farm operations by Erreca is the distinction made of certain cases cited therein. For instance in distinguishing Dietlin v. Missouri State Life Insurance Co., 126 Cal.App.15, 14 P.2d 331, 15 P.2d 188, the court pointed out that recovery for total disability was properly denied, because, 19 Cal.2d at page 398, 121 P.2d at page 696, "unlike respondent (Erreca), *he was still able to perform the managerial and supervisorial activities connected with his business*."

As to Missouri State Life Ins. Co. v. Snow, 185 Ark. 355, 47 S.W.2d 600, the California court said, 19 Cal.2d at page 398, 121 P.2d at page 696:

"The insured was a farm operator who suffered a hip injury which disabled him from performing manual labor. He farmed through tenants, however, and his injury in no way prevented him from *supervising farm operations*."

As to Aetna Life Ins. Co. v. Person, 188 Ark. 864, 67 S.W.2d 1007, the court said "the insured * * * was a farm operator who contracted an arrested case of tuberculosis. Despite his ailment, he was able to *manage his various farms in his usual and customary manner*."

The following quotation clearly shows the distinction between the Erreca case and the instant one, 19 Cal.2d at pages 398–399, 121 P.2d at page 696:

"The cases of Azevedo v. Mutual Life Ins. Co. of N. Y., 308 Mass. 216, 31 N.E. 2d 559, 561; Fricke v. Mutual Life Ins. Co. of N. Y., 152 Kan. 525, 106 P.2d 677; New York Life Ins. Co. v. Stoner, 8 Cir., 109 F.2d 874; and Mutual Life Ins. Co. of N. Y. v. King, Tenn.App., decided December 10, 1940, are also factually different from the present one. In each of them, recovery for total disability benefits was denied a farm operator who, *although incapacitated from engaging in manual tasks, was able to, and, did, manage, supervise and direct the operations of his farms and attend to all the business in connection with them*. The evidence in this case shows that the respondent is unable to inspect his lands, direct the labor in progress or perform any other essential supervisory functions." (Italics supplied.)

"called upon to determine as best we may what the Supreme Court of Arizona would hold if confronted with the controversy now presented to us", I think the opinion of the able and conscientious trial Judge, with long experience at the Bar and on the Bench in that State should not be wholly without persuasiveness.

Under the facts in this record, the testimony of the physician quoted in the majority opinion, together with all the other evidence, does not constitute "substantial, relevant evidence in favor" [2] of the appellant so as to have required the trial Judge to submit the case to the jury on defendant's motion for a directed verdict.

And while the law of Arizona may not be settled as to what constitutes total and permanent disability under a policy of insurance such as here, it is the settled rule of Arizona that the final test on a motion for a directed verdict is whether or not the Judge would be compelled to grant a new trial if the case were then submitted to the jury and a verdict returned against the maker of the motion. Cope v. Southern Pacific, 66 Ariz. 197, 185 P.2d 772; Arizona Birmingham Copper Co. v. Dickson, 22 Ariz. 163, 195 P. 538, 44 A.L.R. 881; Southern Pacific Co. v. Fisher, 35 Ariz. 87, 274 P. 779. And while we have nothing here but the "unrevealing words of the cold record", [3] the "dead page," [4] it must be remembered that such was not the case with the trial Judge. He saw and heard the witnesses, including the plaintiff. The "tone of voice" and "gloss that personality puts upon speech" [5] were available to him as well as the degree of agility of the plaintiff. He was in a better position than we are to determine whether or not mere words constituted "substantial, relevant evidence" in favor of appellant so that if a verdict were returned in his favor, he, the trial

Judge, in the conscientious exercise of his duty, would have been compelled to grant a new trial. His judgment should not be disturbed.

I would affirm.

---

2. Butte Copper & Zinc Co. et al. v. Armerman, et al., 9 Cir., 1946, 157 F.2d 457–458; Cope v. Southern Pac. Co., 1947, 66 Ariz. 197–204, 185 P.2d 772.

3. Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309; Frankfurter, J. in dissent 332 U.S. at page 729, 68 S. Ct. at page 326.

4. Idem 332 U.S. at page 730, 68 S.Ct. at page 326.

5. Idem 332 U.S. at page 730, 68 S.Ct. at page 326.